U.S. DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

OCT 23 2014

FILED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 1:14-cr-86-03-JL |
| | ) | No. 1:14-cr-87-02-PB |
| WILLIAM SWANSON | ) | |
| | ) | |

**PLEA AGREEMENT**

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States of America, by its attorney, John Kacavas, United States Attorney for the District of New Hampshire, and the defendant, William Swanson, and his attorney, John T. Pendleton, Esquire, enter into the following Plea Agreement.

1. **The Plea and Offense**.

The defendant, William Swanson, agrees to plead guilty:

(1) to a one-count Indictment (Cr. No. 1:14-cr-86-03-JL), which charges him with engaging in a conspiracy from in or around September 2013, through June 24, 2014, in the District of New Hampshire, to distribute, and possess with intent to distribute, oxycodone, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and

(2) to Count One (1) and Two (2) of a five-count Indictment (Cr. No. 1:14-cr-87-02-PB), which charges him with:

(a) engaging in a conspiracy from in or around September 2013, through June 24, 2014, in the District of New Hampshire, to distribute, and possess with intent to distribute, marijuana, a schedule I controlled substance (Count One (1)), in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and

1

(b) the distribution of marijuana, a schedule I controlled substance, on October 10, 2013 (Count Two (2)), in violation of Title 21, United States Code, Section 841(a)(1).

2. **The Statute and Elements of the Offense**.

Title 21, United States Code, Section 846 provides that:

> [a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

See 21 U.S.C. § 846.

Title 21, United States Code, Section 841(a)(1) provides, in pertinent part, that:

> (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally -
>
> > (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

See 21 U.S.C. § 841(a)(1).

In order to prove that defendant engaged in a conspiracy from in or around September 2013, through June 24, 2014, in the District of New Hampshire, to distribute, and possess with intent to distribute, oxycodone, a schedule II controlled substance, as charged in the United States' one-count Indictment (Cr. No. 1:14-cr-86-03-JL), the Government would have to prove the following four (4) essential elements beyond a reasonable doubt:

**One:** That a conspiracy involving two or more persons must have existed to commit the offense charged in the Indictment, that is, to distribute, and possess with intent to distribute, oxycodone;

**Two:** That defendant must have joined the conspiracy with knowledge of the existence of the conspiracy and its criminal objectives;

2

> **Three:** That defendant must have knowingly, voluntarily and intentionally become a member of the conspiracy; and
>
> **Four:** That in joining the conspiracy, defendant must have intended to achieve the unlawful objectives of the conspiracy.

In order to prove that defendant engaged in a conspiracy from in or around September 2013, through June 24, 2014, in the District of New Hampshire, to distribute, and possess with intent to distribute, marijuana, a schedule I controlled substance, as charged in Count One (1) of the United States' five-count Indictment (Cr. No. 1:14-cr-87-02-PB), the Government would have to prove the following four (4) essential elements beyond a reasonable doubt:

> **One:** That a conspiracy involving two or more persons must have existed to commit the offense charged in the Indictment, that is, to distribute, and possess with intent to distribute, marijuana;
>
> **Two:** That defendant must have joined the conspiracy with knowledge of the existence of the conspiracy and its criminal objectives;
>
> **Three:** That defendant must have knowingly, voluntarily and intentionally become a member of the conspiracy; and
>
> **Four:** That in joining the conspiracy, defendant must have intended to achieve the unlawful objectives of the conspiracy.

In order to prove that defendant distributed marijuana, a schedule I controlled substance, on October 10, 2013, as charged in Count Two (2) of the United States' five-count Indictment (Cr. No. 1:14-cr-87-02-PB), the Government would have to prove the following three (3) essential elements beyond a reasonable doubt:

> **One:** Defendant possessed the controlled substance marijuana on October 10, 2013;

| | |
|---|---|
| **Two:** | Defendant knew that the substance was a controlled substance; and |
| **Three:** | Defendant distributed the controlled substance knowing that he was distributing a controlled substance. |

3. **Offense Conduct**.

The defendant stipulates and agrees that if the case proceeded to trial, the United States would prove the following facts beyond a reasonable doubt.

**Conspiracy to Distribute Marijuana and Distribution of Marijuana**
**Cr. No. 1:14-cr-87-02-PB**

In September 2013, a confidential informant, CI # 2, who began cooperating with law enforcement because of a desire to obtain leniency with respect to a possible criminal prosecution, advised that it (CI # 2) had recently engaged in a conversation with William Swanson ("Swanson"). According to CI # 2, Swanson informed it that he (Swanson) could provide it (CI # 2) with pound quantities of marijuana for distribution. Swanson also told CI # 2 that each pound would cost $3,350.00 in United States currency, but that if it (CI # 2) purchased ten (10) or more pounds of marijuana, each pound would cost $3,300.00 in United States currency. CI # 2 stated that Swanson identified Kristopher Venturini ("Venturini") as the source of supply for the marijuana.

On October 9, 2013, law enforcement instructed CI # 2 to contact Swanson in order to inquire about the purchase of marijuana. During the conversation, Swanson informed CI # 2 that Venturini had recently received a shipment of marijuana and had twelve (12) pounds left for distribution. Based upon information obtained from CI # 2, law enforcement instructed it to make arrangements with Swanson to purchase two (2) pounds of marijuana on October 10, 2013.

On October 10, 2013, law enforcement met with CI # 2 and instructed it to call Swanson at (603) 497-7902. During the conversation, which was monitored by law enforcement, Swanson

agreed to obtain two (2) pounds of marijuana for CI # 2 and indicated that the marijuana transaction would take place at 7:00 p.m. because Venturini was not available until after 7:00 p.m.

At 5:20 p.m., law enforcement established surveillance at 116 Dartmouth Street, Manchester, New Hampshire, the location of Swanson's residence, and 374 Thornton Street, Manchester, New Hampshire, the location of Venturini's residence. At 6:50 p.m., law enforcement observed Swanson, who was located in a 2006 Cadillac Escalade, New Hampshire registration 3369340, registered to William Swanson, 787 Hanover Street, Manchester, New Hampshire, enter the Cadillac and depart the area. At approximately 8:00 p.m., Swanson contacted CI # 2 and indicated that he would obtain the marijuana and bring it to CI # 2's residence. At 8:02 p.m., law enforcement observed that CI # 2 received a text message from Swanson which stated, "2?," a reference to the fact that CI # 2 intended to purchase two (2) pounds of marijuana from Swanson. Following receipt of the text message, CI # 2 was provided with $6,700.00 in United States currency by law enforcement and advised to remain at its residence.

Because law enforcement believed that Swanson would travel to Venturini's residence in order to obtain the marijuana for CI # 2, law enforcement followed Swanson. At 8:05 p.m., law enforcement followed Swanson from his residence, 116 Dartmouth Street, directly to Venturini's residence, 374 Thornton Street. As soon as Swanson arrived, he entered the residence and remained inside for approximately twelve (12) minutes. After leaving Venturini's residence, Swanson was observed by law enforcement to immediately travel to CI # 2's residence. As soon as he arrived, CI # 2 exited its residence and entered Swanson's vehicle. CI # 2 remained inside Swanson's vehicle for approximately six (6) minutes, during which time the vehicle was observed by law enforcement to travel a short distance from the residence and return again. When CI # 2 exited Swanson's vehicle, it met with law enforcement and turned over approximately two (2) pounds of marijuana. CI # 2, who was searched for evidence of

5

unexplained amounts of currency and contraband with negative results, stated that when Swanson arrived at its residence, it (CI # 2) exited the residence and entered Swanson's motor vehicle. Swanson, according to CI # 2, made a short loop around CI # 2's neighborhood and provided CI # 2 with the marijuana during the drive.   In return for the marijuana, CI # 2 provided Swanson with $6,700.00 in United States currency.

Following CI # 2's marijuana purchase from Swanson, law enforcement obtained toll records for Swanson's cellular telephone, (603) 497-7902.   The toll records established that prior to engaging in the marijuana transaction with CI # 2 on October 10, 2013, Swanson was in contact with (603) 703-7704, a cellular telephone utilized by Kristopher Venturini.

On January 6, 2014, United States District Court Judge Landya B. McCafferty granted the United States' request for a search warrant involving the text messaging content for the period of October 6, 2013, through October 16, 2013, involving cellular telephone (603) 497-7902, the cellular telephone utilized by Swanson.   The results disclosed that Swanson utilized the text messaging function on cellular telephone (603) 497-7902 on October 9, 2013, and October 10, 2013, in order to communicate with Venturini over cellular telephone (603) 703-7704 and arrange a meeting to obtain marijuana.   The results of Swanson's text messaging content also established that at 8:05:33 on October 10, 2013,, Swanson utilized (603) 497-7902 to send a text message to CI # 2 which stated, "bout to head to dude call u in a few."   At 8:14:16, Swanson utilized (603) 497-7902 to send a text message to Venturini at (603) 703-7704 which stated, "in route."   Within approximately 10 seconds of obtaining the text message, Venturini sent a text message to Swanson which stated, "k."

## Conspiracy to Distribute Oxycodone
## Cr. No. 1:14-cr-86-03-JL

In addition to providing law enforcement with information involving Swanson's involvement with Venturini in the distribution of marijuana, CI # 2 revealed that an individual named Charles Fowle ("Fowle") was involved in the distribution of numerous controlled substances, including oxycodone. Based upon information obtained from CI # 2, law enforcement initiated an investigation and determined that Fowle obtained significant quantities of oxycodone for distribution which he then supplied to numerous individuals, including William Swanson, for distribution.

On December 8, 2013, United States District Court Judge Paul J. Barbadoro authorized the interception of wire and electronic communications over cellular telephone number (603) 268-1725, the cellular telephone utilized by Charles Fowle. On December 19, 2013, Fowle utilized the cellular telephone in order to discuss the distribution of oxycodone with an unknown male ("UM").

| | |
|---|---|
| UM: | When do you think you'll have those? |
| FOWLE: | Ah, think, ah, I gotta get some money to f—king buy some. That's the problem. |
| UM: | Yeah. |
| FOWLE: | Ah, but I should have some money soon. |
| UM: | Hm. |
| FOWLE: | Well, well. |
| UM: | What do you have now? Do you have any? |
| FOWLE: | Ya, I got a little bit. |
| UM: | Ya. |
| FOWLE: | Gotta be able to buy at least a couple hundred at a time to get them. |
| UM: | Right. |
| FOWLE: | So, ya know. |
| . . . | |
| UM: | Ah, so what do you think you have of them? How many? Like twenty, twenty-five. |
| FOWLE: | Ah, Ah, I could count them right now if you want . . . Let's see what we got. Let's see what we got in the baby socks. Hm, looks like about twenty. |
| UM: | I'll take it then. |
| FOWLE: | Whatever works. |

7

| | |
|---|---|
| UM: | Alright, where are you, home? I'll just come down and grab them right now. Thanks. |
| FOWLE: | Alright. |

The conversation between Fowle and the UM confirmed Fowle's involvement in the distribution of oxycodone. Thus, when Fowle advised the UM that he needed to "be able to buy at least a couple hundred at a time," he was referring to oxycodone, which is generally purchased in quantities in excess of 100 tablets by individuals who are engaged in the distribution of significant quantities of oxycodone.

Fowle's involvement in the distribution of oxycodone was confirmed on December 20, 2013, when he received a text message and in-coming call from an individual identified as Brian Robichaud ("Robichaud"). At approximately 10:11 a.m., Robichaud sent Fowle a text message which stated, "call me ASAP bud . . . save a bunch of little guys." At 1:45 p.m. on the same day, Robichaud contacted Fowle again and inquired about the purchase of oxycodone.

| | |
|---|---|
| ROBICHAUD: | But you get my message earlier? |
| FOWLE: | Ya, you wanted. Ya, I don't right now at this second. I don't have those, but I will today. Later today. |
| ROBICHAUD: | You will today? Okay, I need a one hundo. |
| FOWLE: | How many? |
| ROBICHAUD: | I need a hundo. |
| FOWLE: | Oh, okay. |

Based upon information obtained during the investigation, law enforcement determined that Robichaud contacted Fowle in order to arrange for the purchase of 100 tablets ("a hundo") of oxycodone.

The intercepted conversations also established that Fowle distributed oxycodone to William Swanson. For example, on December 22, 2013, Swanson contacted Fowle and inquired about the availability of oxycodone for distribution.

| | |
|---|---|
| SWANSON: | Okay, so there's no chance that your gonna be dry later? |
| FOWLE: | I don't think so because I can get them whenever I want, but I just sent, I just sent this kid to go get me some right now. |
| SWANSON: | Huh? |

8

| | |
|---|---|
| FOWLE: | <u>I just went, I got, I got some coming here right now.</u> |
| SWANSON: | <u>You got someone coming there right now?</u> |
| FOWLE: | <u>No, I got, I got, I got a couple hundred of them, so.</u> |
| SWANSON: | Alright, I was gonna say can you, can you uh?   I'm in the middle of Christmas shopping or whatever, so I definitely want to come by there before I do go home. I don't know what time it's gonna be? |
| FOWLE: | Yup. |
| SWANSON: | <u>So I kinda wanted you to just put like, uh, twenty away.</u> |
| FOWLE: | <u>Alright, I can do that.</u> |
| SWANSON: | Hold twenty for me. |
| FOWLE: | Yup. |
| SWANSON: | Alright. |

The investigation also demonstrated that Fowle had been supplying Swanson with oxycodone for distribution for several months and that Swanson obtained between 10-30 tablets of oxycodone each time he obtained the controlled substance from Fowle.

### 4. **<u>Penalties</u>**.

The defendant understands that the penalties for the offenses are:

A.  With respect to Count One (1) in Cr. No. 1:14-cr-86-03-JL (Conspiracy to Distribute Oxycodone):

> (1) a term of imprisonment which may not be more than twenty (20) years;
> (2) a fine of $1,000,000.00; and
> (3) a term of supervised release which may not be less than three (3) years nor more than life.   The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve in prison all or part of the term of supervised release with no credit for time already spent on supervised release (18 U.S.C. §3583).

B.  With respect to Count One (1) (Conspiracy to Distribute Marijuana) and Count Two (2) (Distribution of Marijuana) in Cr. No. 1:14-cr-87-02-PB:

> (1) a term of imprisonment which may not be more than five (5) years;
> (2) a fine of $250,000.00; and
> (3) a term of supervised release which may not be less than two (2) years nor more than life.   The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve

9

in prison all or part of the term of supervised release with no credit for time already spent on supervised release (18 U.S.C. §3583).

C. The defendant also understands that he will be required to pay a special assessment of $100.00 for each count of conviction ($300.00), which the defendant agrees to pay at or before the time of sentencing, and that the Court may order him to pay restitution to the victim of the offense, pursuant to 18 U.S.C. § 3663 or § 3663A.

5. **Sentencing and Application of the Sentencing Guidelines**.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines. The defendant further understands that the defendant has no right to withdraw the defendant's guilty plea if the applicable advisory guideline range or the defendant's sentence is other than the defendant anticipated, except as expressly provided in this Plea Agreement.

The defendant also understands that the United States and the United States Probation Office shall:

A. advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

B. respond to questions from the Court;

C. correct any inaccuracies in the pre-sentence report;

D. respond to any statements made by the defendant or the defendant's counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant is aware that any estimate of the probable sentence or the probable sentencing range relating to the defendant pursuant to the advisory Sentencing Guidelines that

the defendant may have received from any source is only a prediction and not a promise, and is not binding on the United States, the Probation Office, or the Court, except as expressly provided in this Plea Agreement.

6. **Stipulations and Other Agreements.**

The Government and the defendant have reached the following stipulation pursuant to Fed. R. Crim. P. 11(c)(1)(C).

A. The parties agree that defendant will be sentenced to a 24 month term of incarceration.

The parties intend the above stipulation to be binding under Fed. R. Crim. P 11(c)(1)(C). By using the word "binding," the parties mean that if the Court does not accept the stipulation, pursuant to Fed. R. Crim. P. 11(c)(3)(A), the plea agreement is null and void. The parties will not be allowed to vacate or withdraw from the Plea Agreement for any other reason.

7. **Acceptance of Responsibility.**

The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense. The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

A. fails to admit a complete factual basis for the plea at the time the defendant is sentenced or at any other time;

B. challenges the United States' offer of proof at any time after the plea is entered;

C. denies involvement in the offense;

D. gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

11

E.  fails to give complete and accurate information about the defendant's financial status to the Probation Office;

F.  obstructs or attempts to obstruct justice, prior to sentencing;

G.  has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

H.  fails to appear in court as required;

I.  after signing this Plea Agreement, engages in additional criminal conduct; or

J.  attempts to withdraw the plea of guilty.

The defendant understands and agrees that the defendant may not withdraw the defendant's guilty plea if, for any of the reasons listed above, the United States does not recommend that the defendant receive a reduction in the defendant's sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is under no obligation to reduce the offense level if it finds that the defendant has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and the defendant has assisted the United States in the investigation or prosecution of the defendant's own misconduct by timely notifying the United States of the defendant's intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

8. **Waiver of Trial Rights and Consequences of Plea.**

The defendant understands that the defendant has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent the defendant. The defendant understands that the defendant has the right:

A. to plead not guilty or to maintain that plea if it has already been made;

B. to be tried by a jury and, at that trial, the right to the assistance of counsel;

C. to confront and cross-examine witnesses against the defendant;

D. not to be compelled to provide testimony that may incriminate the defendant; and

E. to compulsory process for the attendance of witnesses to testify in the defendant's defense.

The defendant understands that by pleading guilty the defendant waives and gives up those rights and that if a plea of guilty is accepted by the Court, there will not be a trial of any kind.

The defendant understands that if the defendant pleads guilty, the Court may ask the defendant questions about the offense, and if the defendant answers those questions falsely under oath, on the record, and in the presence of counsel, the defendant's answers may later be used against the defendant in a prosecution for perjury or making false statements.

9. **Acknowledgment of Guilt; Voluntariness of Plea.**

The defendant acknowledges that the defendant:

A. is entering into this Plea Agreement and is pleading guilty freely and voluntarily because the defendant is guilty;

B. is entering into this Plea Agreement without reliance upon any discussions with the United States and without promise of benefit of any kind except as described in this Plea Agreement;

C. is entering into this Plea Agreement without threats, force, intimidation, or coercion of any kind;

D. understands the nature of the offense to which the defendant is pleading guilty, including the penalties provided by law; and

E. is completely satisfied with the representation and advice received from the defendant's undersigned attorney.

**10. Scope of Agreement.**

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-federal, state or local authority. The defendant also acknowledges that no representations have been made to him about any civil or administrative consequences that may result from the defendant's plea of guilty. The defendant understands such matters are solely within the discretion of the specific non-party government agency involved. The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

**11. Collateral Consequences.**

The defendant understands that the defendant will be adjudicated guilty of the offense to which the defendant will plead guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

12. **Satisfaction of Federal Criminal Liability; Breach.**

The defendant's guilty plea, if accepted by the Court, will satisfy any federal criminal liability of the defendant in the District of New Hampshire as a result of the defendant's participation in the conduct which forms the basis of the Indictment in this case. The defendant understands that if, before sentencing, the defendant violates any term or condition of this Plea Agreement, engages in any criminal activity, or fails to appear for sentencing, the United States may consider such conduct to be a breach of the Plea Agreement and may withdraw from it.

13. **Waivers.**

A. Appeal

The defendant is aware that the defendant has the right to challenge the defendant's sentence and guilty plea on direct appeal. By entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to challenge on direct appeal:

1. The defendant's guilty plea and any other aspect of defendant's conviction, including, but not limited to, any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues; and

2. The defendant's sentence imposed by the Court if within the terms agreed upon and stipulated to in this Plea Agreement.

The defendant's waiver of rights does not operate to waive appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel. ~~in the negotiation of this Plea Agreement or at the sentencing hearing.~~

B. **Collateral Review**

The defendant understands that he may have the right to challenge his guilty plea and/or sentence on collateral review, e.g., a motion under 28 U.S.C. 2255 or 2241. By entering into this

15

Plea Agreement, the defendant knowingly and voluntarily waives his right to collaterally challenge:

1. The defendant's guilty plea and any other aspect of defendant's conviction, including, but not limited to, any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues; and

2. The defendant's sentence imposed by the Court if within the terms agreed upon and stipulated to in this Plea Agreement.

The defendant's waiver of the right to collateral review does not extend to claims that the plea was unknowing or involuntary or to claims that the defendant received ineffective assistance of counsel. ~~in the negotiation of the plea, plea agreement or the sentencing hearing.~~ The defendant's waiver of his right to collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated by the Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C. **Freedom of Information and Privacy Acts.**

The defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. 552, or the Privacy Act of 1974, 5 U.S.C. 522a.

D. **Appeal by the Government**

This Plea Agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. 3742(b), and the United States therefore retains its appeal rights.

16

14. **No Other Promises**.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

15. **Final Binding Agreement**.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and his attorney and until signed by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney.

16. **Agreement Provisions Not Severable.**

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

Dated: October 23, 2014.

JOHN KACAVAS
United States Attorney

By: _____
Terry L. Ollila
Assistant U.S. Attorney
U.S. Attorney's Office
Bar No. 560603
55 Pleasant Street
Concord, NH 03301
(603) 225-1552

The defendant certifies that he has read this 17-page Plea Agreement and that he fully understands and accepts the terms thereof.

Date: October 23, 2014.

William Swanson, defendant

I have read the above and explained it to my client, who advises me that he understands and accepts its terms.

Date: October 23, 2014.

John T. Pendleton, Esquire,
Counsel for defendant

17